AO 93 (Rev. 11/13) Search and Seizure Warrant

**FILED**

JAN 2 6 2021

U. S. DISTRICT COURT
E. DIST. OF MO.
ST. LOUIS

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

**HSD**

**(Highly Sensitive Document)**

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

A cellular device using cellular phone number ████████

Case No.  4:21 MJ 1001 JMB

Doc # 2

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the          EASTERN          District of          MISSOURI
*(identify the person or describe the property to be searched and give its location):*

A cellular device using cellular phone number ████████

[STAMP] ...LERK
A TRUE COPY OF THE ORIGINAL
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
BY: M. Clayton
DEPUTY CLERK

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized):*

SEE ATTACHMENT A

**YOU ARE COMMANDED** to execute this warrant on or before          February 9, 2021          *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to          Honorable John M. Bodenhausen          .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   1/26/2021  4:00pm

Judge's signature

City and state:      St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### ITEMS TO BE SEARCHED

The following materials, in any format or medium, which constitute evidence,

instrumentalities, and fruits of the criminal violations of 18 U.S.C. §666, §1341, §1343, §1346,

and §1951 and involve John Collins-Muhammad, and others from ▮▮▮▮▮▮▮ through the

time of the execution of this warrant that may be deemed instrumentalities, fruits, or evidence of

the aforementioned crimes to include:

1.    The cellular telephone, that being an Apple iPhone 7, serial number

▮▮▮▮▮▮▮▮▮ with associated phone number ▮▮▮▮▮▮▮ (The Device)

2.    For the Device, all records and information to include:

a.    Call Logs showing numbers called and received, to include deleted logs;

b.    Evidence of user attribution showing who used or owned the Device at the

time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history;

c.    Internet browsing history, including records of Internet Protocol addresses

used; records of Internet activity, including firewall logs, caches, browser history and

cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into

any Internet search engine, and records of user-typed web addresses.

d.    Photographs, videos, and other forms of media documenting the events

that are the subject of this warrant.

e.    Any and all contact lists, address books, in whatever form regarding

coconspirator contact information, to include deleted information.

f.    all bank records, checks, credit card bills, account information, and other

financial records.

1

g.    Text message records, including the content of messages as well as any logs showing text messages sent and received, to include deleted information

h.    Any and all documents, notes, and records, including e-mail correspondence in whatever form, including digital, relating to the matters set forth in the attached Affidavit, to include deleted information

i.    Any and all documents, notes, and records relating to the ownership and usage of the cell phone being searched

j.    Any and all contact lists, address books, in whatever form regarding coconspirator contact information, to include deleted information

3.   As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

**UNITED STATES DISTRICT COURT**

for the

Eastern District of Missouri

AN 2 6 2021

U STRICT COURT
DIST. OF MO.
ST. LOUIS

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

A cellular device using cellular phone number ▇▇▇▇▇

)
)
)
)
)
)

Case No.  4:21 MJ 1001 JMB

Doc # 1

**(Highly Sensitive Document)**
HSD

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

A cellular device using cellular phone number ▇▇▇▇▇ .

located in the ___ EASTERN ___ District of ___ MISSOURI ___ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT A

GREGORY J. LINHARES, CLERK
A TRUE COPY OF THE ORIGINAL
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
BY: M. Craytn
DEPUTY CLERK

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Section 666(a)(1)(A) | Theft or bribery concerning programs receiving Federal funds |
| 18 U.S.C. Section 1951 | Hobbs Act |
| 18 U.S.C. Sections 1341 and 1343 | Mail and Wire Fraud |
| 18 U.S.C. Section 1346 | Honest Services Fraud |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing is true and correct.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

*Printed name and title*

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date:  1/26/2021

*Judge's signature*

City and state:  St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge

*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

GREGORY J. LINHARES, CLERK
A TRUE COPY OF THE ORIGINAL
UNITED STATES DISTRICT COURT
EAST DISTRICT OF MISS
BY: *M. Crayn*
DEPUTY CLERK
FILED

JAN 26 2021

U. S. DISTRICT COURT
E. DIST. OF MO.
ST. LOUIS

In the Matter of the Search of a cellular device
using cellular phone number ███████

Case No. 4:21 MJ 1001 JMB

**HSD**

**Filed Under Seal** Highly Sensitive Document)

Doc #1

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH WARRANT**

I, Special Agent ██████████, being first duly sworn, hereby depose and state as

follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant to search

instrumentalities and evidence of violations of Title 18 U.S.C. §§ 666(a)(1)(A), 1951, 1341, 1343,

1346, and 2 formerly belonging to John Collins-Muhammad (JCM), Alderman, St. Louis City,

Missouri. The item that is the subject of the search applied for is an Apple iPhone 7 Plus, serial

number ███████ with associated phone number ███████ previously operated by

JCM (The Device) for the purpose of searching for evidence of violations of Title 18 U.S.C. §§

666(a)(1)(A), 1951, 1341, 1343, 1346, and 2 related to the providing of official action in exchange

for the acceptance of cash bribes and other benefits and things of value for personal enrichment.

There is probable cause to believe that evidence of these violations will be found on the cellular

telephone (The Device) identified in Attachment A.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been

so employed since 2002. I am presently assigned to the Public Corruption squad in the St. Louis

Division of the FBI. My responsibilities include the investigation of federal crimes to include

violations of Title 18 United States Code (U.S.C.) § 666 (Theft or bribery concerning programs

receiving Federal funds), § 1346 (Honest Services Fraud), § 1341 (Mail Fraud) and § 1343 (Wire

Fraud) and §1951 (Hobbs Act). I received over eighteen weeks of specialized law enforcement

training at the FBI Academy in Quantico, Virginia. My experience obtained as a Special Agent of the FBI has included investigations of multiple violations of federal criminal public corruption laws. I know cellular telephones are commonly used by politicians to communicate with donors, constituents, and employees. Cellular telephones enable a politician to communicate during the day when they are not at an office location, which is common with this type of work. Cellular telephones also enable the user to quickly send text messages and emails to other people when they are unable to take the time to make a phone call, but the sender needs to quickly convey their message.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 666 (Theft or bribery concerning programs receiving federal funds), 1341 (Mail Fraud), 1343 (Wire Fraud), 1346 (Honest Services Fraud), and 1951 (Hobbs Act) have been committed by John Collins-Muhammad, St. Louis City Alderman. There is also probable cause to believe that The Device identified in Attachment A contains evidence of these crimes and contraband or fruits of these crimes, as described in Attachment A.

## PROBABLE CAUSE

5.      The FBI opened an investigation of St. Louis City 21st Ward Alderman John Collins-Muhammad (JCM) on ▮▮▮▮▮▮ ▮▮▮▮▮ Confidential Human Source 1 (CHS 1) owns businesses in JCM's St. Louis Ward. JCM has solicited and accepted cash bribes and other benefits and things of value from CHS 1 since ▮▮▮▮▮▮ in exchange for official action as a St. Louis Alderman. JCM has talked with CHS 1 about other City Aldermen who will accept bribes for their

2

official action. JCM arranged a meeting with ▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮ and CHS 1. The meeting involved discussion of the ▮▮▮▮▮▮ assisting CHS 1 in obtaining ▮▮▮ government contracts in exchange for money (campaign contributions or otherwise). JCM also facilitated meetings for CHS 1 to meet with two other City Aldermen, both of whom accepted cash bribes from CHS 1 in exchange for their official action.

6.      CHS 1 has provided significant information and evidence to support the establishment of probable cause in this affidavit. The majority of CHS 1's information is corroborated by audio and video recordings, as well as text messages, email, and other documents. CHS 1 is currently under federal indictment on charges of trafficking contraband cigarettes, trafficking synthetic drugs, and money laundering. HSI investigated that case and CHS 1 was charged in the Eastern District of Missouri during 2017. In addition to potential imprisonment and fines, CHS 1 is facing potential deportation as a result of those pending charges. In approximately ▮▮▮▮▮▮▮ CHS 1 began providing information to the FBI about corrupt public officials in St. Louis City and County, including but not limited to JCM. CHS 1 is cooperating with the FBI and the United States Attorney's Office for potential consideration on his/her pending charges and also to expose politicians who prey on CHS 1 as an immigrant business owner. ▮▮▮▮▮▮▮

and have deemed CHS 1 to be credible and reliable, with the vast majority of CHS 1's information corroborated with audio and video recordings, text messages, email, and other documents.

7.      During the course of the investigation, JCM has used his cellular telephone, ▮▮▮▮

▮▮▮▮  The Device, to conduct criminal activity. On or about January 16, 2020, CHS 1 called

JCM on The Device to arrange a meeting. As a result of that call, on January 18, 2020, JCM came

to one of CHS 1's businesses. During their meeting, CHS 1 stated, "If you could help it would be

phenomenal." JCM replied, "Tell me what you need." CHS 1 then asked JCM for his assistance

and official action in obtaining liquor licenses and property tax abatements for CHS 1's businesses

in JCM's and other St. Louis City Wards. JCM told CHS, "I can take care of you in my Ward."

JCM made other assurances to CHS 1 that he could assist with a property tax abatement for his/her

business over a ten-year period by submitting an Aldermanic letter of support, which was

necessary to receive such an abatement. JCM also told CHS 1 if the abatement approval was

taking too long, JCM would help move it along. JCM told CHS 1 the annual property taxes on the

property were approximately $17,000. This meeting was recorded.

8.      On or about January 20, 2020, JCM sent a text message from The Device to CHS

1 stating, in part, "I got your letter of approval for tax abatement."

9.      On January 21, 2020, JCM brought the tax abatement forms and his official

Aldermanic letter of support to CHS 1. JCM provided the name of the St. Louis City employee

who CHS 1 was to submit the completed forms to. Also during this meeting, CHS 1 told JCM the

savings related to this property tax abatement amounted to approximately $130,000 over 10 years.

This meeting was recorded.

10.     On January 24, 2020, JCM texted CHS 1 from The Device, "What time will you be

at station?" in order to set up a meeting. JCM then met later that same day with CHS 1 to discuss

the status of the tax abatement paperwork. During this meeting, JCM discussed other similar deals

he could assist CHS 1 with, including introducing CHS 1 to another City Alderman in a different

Ward, ▮▮▮▮▮  where CHS 1 owned and operated a business. At the end of this meeting,

4

CHS 1 asked JCM, "What do I owe you for this?" JCM stated, "25". JCM stated he would return at 4:00 pm that day to collect the money. This meeting was recorded.

11.    JCM returned to CHS 1's store at approximately 4:00 pm on January 24, 2020. During their meeting, CHS 1 gave JCM $2,500 cash which the FBI had previously provided CHS 1. JCM immediately placed the cash bribe into his front-right jacket pocket. CHS 1 thanked JCM for his help on obtaining the property tax abatement, to which JCM replied, "That's our job. That's the job for an Alderman." This meeting was recorded.

12.    On January 31, 2020, JCM met with CHS 1 and during the meeting, CHS 1 gave JCM a check payable to St. Louis City for the administrative charges related to the property tax abatement application. JCM told CHS 1 the paperwork CHS 1 gave JCM looked good and the approval would take about one week. JCM told CHS 1, once approved by the City, the property would receive favorable tax abatement treatment from 2021-2030.

13.    The tax abatement process for CHS 1's business has taken longer than expected due to COVID-19 delays with St. Louis City administration. JCM assisted CHS 1 with getting the development project approved by the St. Louis Development Corporation's Land Clearance for Redevelopment Authority (LCRA). During a November 30, 2020 text message exchange between CHS 1 and JCM on The Device, CHS 1 told JCM that an employee from the LCRA said the property tax abatement was not ready yet. JCM responded the same day via text message from The Device, "Call him again! It's done!", then, "I had to pass a board bill authorizing it. I did. It's passed completely". According to the Board of Aldermen website, as of January 14, 2021, the tax abatement has been introduced by JCM to the Board of Aldermen as Board Bill 108, where it is awaiting final passage and signature by the Mayor.

14.    During the same above-referenced January 31, 2020 meeting, CHS 1 asked JCM how CHS 1 should approach Alderman ██████████ in order to get a similar property tax abatement for a property owned by CHS 1 in ████ Ward. During that discussion, JCM

5

described how CHS 1 should make the [bribe] payment to ▮▮▮▮ - using an intermediary. JCM told CHS 1 to bring ▮▮▮▮▮▮▮▮▮ assistant, in to "do some bullshit consulting". JCM first suggested CHS 1 pay $5,000 for the "consulting" in exchange for the property tax abatement support letter. Later, during the same conversation, JCM suggested paying $3,000 to ▮▮▮ JCM explained ▮▮▮ needed the money, stating she had not paid her own personal property taxes. JCM then assured CHS 1 that JCM previously told ▮▮▮ "We're good," which was understood to mean both Aldermen, JCM and ▮▮▮, and CHS 1 were all on the same page regarding the payment and acceptance of illegal bribes in exchange for official action.  JCM told CHS 1 that ▮▮▮ "does business under the table". Later that same day, CHS 1 met with ▮▮▮ and they discussed ▮▮▮ providing CHS 1 with his Aldermanic letter of support for a tax abatement on CHS 1's property in ▮▮▮ Ward. At the end of the meeting CHS 1 offered ▮▮▮ $2,000 cash. ▮▮▮ told CHS 1 to make the payment to his assistant, ▮▮▮▮▮▮ CHS 1 immediately traveled to meet ▮▮▮ where, as ▮▮▮ had directed, he gave ▮▮▮ the $2,000 cash. These funds had previously been provided to CHS 1 by the FBI for this purpose. These meetings were recorded.



15.     During March 2020, CHS 1 began talking to JCM about meeting ▮▮▮▮▮▮▮▮ ▮▮▮ in order to gain ▮▮▮▮▮▮▮ support in obtaining ▮▮▮ government contracts. During a March 2, 2020 meeting JCM told CHS 1 that ▮▮▮▮▮▮ supported a planned project that CHS 1 was interested in developing in another Alderperson's Ward. Later in that same meeting, CHS 1 asked JCM if he/she should bring money when he meets ▮▮▮▮▮ JCM advised at that time to talk to ▮▮▮▮ first. It is known to your Affiant that ▮▮▮▮ is a St. Louis attorney, ▮▮▮▮▮▮▮▮▮▮▮▮ and an individual who remains very close to the ▮▮▮▮▮ This meeting was recorded.

16.     On May 12, 2020 JCM and CHS 1 met. During the meeting JCM explained the control ▮▮▮▮▮ has over the awarding of ▮▮▮ government contracts relative to

construction work on the ███████████████████████████████████████ being built

in ████████████ This meeting was recorded.

      17.    On June 17, 2020, JCM texted CHS 1 from The Device, "Meet me at 5:0

(SIC)/5:00/Pick me up from my house/2042 E. Fair", to which CHS 1 responded, "Ok". During

the subsequent meeting, JCM said he has known ████████████ since 2010. CHS 1 also

informed JCM that he had a construction business that he was trying to get the WBE (Women's

Business Enterprise) certification completed for and asked if JCM could help with the certification.

JCM told CHS 1 that he could assist CHS 1 and that he knew someone who worked at the state

office which handles the Missouri WBE certification process. JCM informed CHS 1 that if he

wanted a contract relative to the ████████ construction site worth millions of dollars,

████████████ was the one to provide those contracts. During the meeting, CHS 1 suggested

asking ████████████ for help with small, municipal matters which CHS 1 has been unable to

resolve. JCM told CHS 1 that ████████████ does not get involved in those types of matters.

JCM stated ████████████ gets involved in matters that make him money and things that make

sense to him. Early in the meeting, JCM said he would text ████████████ [from The Device]

at that time. JCM stated attorney ████████ is ████████████ "right hand man." ████

introduced JCM to ████████████ several years ago. ████ is a "big-time lawyer," but his

real job is taking care of ████████. Any meeting with ████████████ would likely

include ████. Approximately one hour and eighteen minutes into JCM and CHS 1's meeting,

████████████ called The Device. JCM put ████████████ on speaker phone. JCM and

████████████ conversed for approximately three minutes during which time ████████████

did not know CHS 1 was listening. ████████████ asked JCM "what you got?" and

stated he ████████████ had seen JCM's note. Affiant believes ████████████

immediate reference to the "note" during the call is evidence that JCM did in fact send a text

message from The Device to ████████████ while in the company of CHS 1. JCM told

7

███████████████ he had a business owner [CHS 1] who did a lot of business in JCM's ward and

in St. Louis City.  JCM told ███████████the business owner [CHS 1] wanted an opportunity

to meet ████████████ and to contribute to his campaign in a "major way".  ███████████

█ responded by telling JCM that he was coming to St. Louis on ████████████ and ████████

█ suggested they meet.  ████████████ agreed to meet CHS 1 and JCM at one of CHS 1's

businesses in St. Louis. ████████████ stated he planned to come straight to the business upon

arrival in St. Louis at which time he could "get the check."  This meeting and speakerphone

conversation were recorded.  The 3 minute 39 second telephone call between JCM and the

████████████ was also captured on a court ordered pen register, previously placed on The Device,

consistent with the time and duration of CHS 1's meeting with JCM.

   18.   Following JCM's call with ████████████ CHS 1 asked JCM if CHS 1 should

throw ████████████ "something" [money].  JCM replied, "Fuck yea, you should throw him

something."  CHS 1 said, "Huh?", to which JCM stated, "Yea, you should throw him something...if

you don't throw him something, he'll never come back."  CHS 1 asked if he should give

████████████ $10,000 and JCM said that amount was good.  JCM told CHS 1 that

████████████ would probably have a security detail with him, but the detail knew to step

away when ████████████ was about to conduct "business".  CHS 1 said he/she would give

money to JCM for arranging the meeting with ████████████.  JCM also agreed to split any

profit CHS 1 earned from any contract secured through ████████████  JCM stated it was a

big deal ████████████ was going to come directly to CHS 1, rather than having them meet in

a different location.  The June 17, 2020 meeting with JCM was recorded.

   19.   On June 18, 2020, JCM texted CHS 1 from The Device that ████████████

████ is on his way to the station.  Me too."  Shortly thereafter, CHS 1 and JCM met with

████████████ and a male, later identified by CHS 1 as ████████████

████████████████████████████████████████████████████████



████████████████████████████████████████████████ It is believed that ████

████████████████████████████████████████████ The group initially

stood in a high-traffic area within the gas station/convenience store, and then JCM, CHS 1, and

███████████████████ moved to a small office in the back of the store. CHS 1 described the nature

of his/her various businesses to ██████████████ indicated that he/she owned a construction

company capable of hauling materials, and expressed an interest in obtaining an ███████████

construction site contract. CHS 1 stated that JCM and CHS 1 were "partners," but JCM could not

"have his name on here" to which █████████████ replied, "that's ok...as long as I am helping

John [JCM], that ain't no problem." ██████████████ directed JCM to reach out to ███████

███████, an employee in █████████████ office who works on business liaison matters.

█████████████ wrote ███████████ name on a business card and provided it to JCM and directed

JCM to contact ████████ on Tuesday (June 23, 2020). As █████████████ handed the business

card to JCM, CHS 1 gave ██████████████ an envelope containing $10,000 in cash.  This

$10,000 had been provided to CHS 1 by the FBI for this purpose. ████████████ stated "for

me?" and placed the envelope in his pocket. CHS 1 stated, "Please support us." ████████████

replied, "Alright...man I usually take checks." CHS 1 told ██████████████ that "cash is the

king." ██████████████ looked up to the ceiling and said, "you know you got cameras and shit."

After CHS 1 assured ██████████████ that there were no cameras in the office, ████████████

████ and CHS 1 discussed how many businesses CHS 1 owned. ██████████████ asked how he

should communicate with CHS 1 going forward. CHS 1 told ██████████████ that JCM and the

CHS 1 were partners and they agreed they could communicate with one another through

JCM. CHS 1 stated that "John is my brother." ██████████████ told CHS 1, "If it's anything

other than that, it ain't gonna be good." ██████████████ concluded the office meeting by saying

to the CHS 1, we are "going to get to know each other."  This meeting was recorded.

9

20.    After ███████████ left the gas station in a vehicle driven by ██, CHS 1 and JCM returned to the office of the gas station where CHS 1 paid JCM $3,000 cash for arranging the meeting and helping the CHS 1 to obtain contracts through ███████████. This $3,000 had been provided to CHS 1 by the FBI for this purpose.  CHS 1 told JCM that he/she gave ███████████ $10,000 to which JCM responded, "good". This meeting was recorded.

21.    Shortly thereafter, ███████████ returned to the gas station in ██ vehicle. ██ exited his car, entered the station, and summoned JCM to the vehicle. After speaking briefly with ███████████ at the vehicle, JCM returned to the gas station with the envelope of cash. JCM told CHS 1 that ███████████ believed too many people knew him in the store and someone possibly followed him. JCM returned the envelope of cash to CHS 1 and instructed CHS 1 to instead write checks to ███████████. CHS 1 stated he/she did not want to write checks to ███████████  JCM repeatedly stated this was a "test" and that ███████████ supported CHS 1, so CHS 1 should not fail the test. JCM stated, "I know he takes cash for a fact," but, "It's his first time dealing with you." In the presence of CHS 1, JCM then spoke with ███████████ on The Device.  JCM placed The Device on speaker and ███████████ was heard saying "…███████████████████████████' The pen register on The Device captured the 54 second call on June 18, 2020 with ███████████ phone at a time and duration consistent with CHS 1's consensual monitoring.  Affiant believes JCM's explanation of ███████████ concerns about his first meeting with CHS 1, along with CHS 1's observation of ███████████ concern about surveillance cameras, led ███████████ to return the cash. Affiant further believes ███████████ has other people in place, including ███████████ who can take cash on behalf of ███████████, while insulating him from directly receiving such payments. After the call, JCM directed CHS 1 to write two checks for $5,000 each to ███████████ which is the ███████████  CHS 1 reiterated to JCM that he/she did not want his/her name attached to any money given to

10

█████████████ JCM assured the CHS 1 that ██ was ████████████ "fake business" and the money would go "straight to his █████████ pocket" and "nobody ever knows, it's a fake consulting firm." JCM directed CHS 1 to date the checks differently. This meeting was recorded. CHS 1 subsequently wrote two checks dated "06-18-2020" and "06-25-2020" made payable to ██ for $5,000 each.

22.     At JCM's direction, CHS 1 obtained the checks for ████████████ and then picked JCM up at his house. At JCM's direction, CHS 1 drove JCM to the ████████ owned by ██████ in north St. Louis City. JCM held the two checks as they left the vehicle. JCM and CHS 1 met with ████ outside the Lounge. During the meeting, ████ asked if JCM and the CHS 1 were going to meet with ████████████ After telling ████ the meeting already happened, ████ "He told me you all had a meeting." JCM gave the two checks to ████ on behalf of CHS 1. CHS 1 and JCM drove back to JCM's house. As they drove, JCM told CHS 1 he sent a text to ████████████ on The Device saying, "Done", to inform ██████████ the checks were given to ████ JCM showed CHS 1 a text response on The Device from ██████████ to JCM. CHS 1, while looking at The Device, read aloud, "You're the best", with the emojee of the yellow smiley face with black sunglasses. Affiant believes this text exchange is significant because it showed that while ████████████ was cautious with CHS 1 by returning the cash, ██████████ provided positive feedback to JCM for finding someone who can and will pay bribes. The meeting ended with JCM telling CHS 1 to get the company paperwork to JCM so he could get CHS 1 the minority business enterprise (MBE) or women's business enterprise (WBE) certification for CHS's company, which JCM believed was integral to obtaining contracts through ██████████ The June 18, 2020 meetings with JCM, ████████, and ████ were recorded. The pen register did not capture the text exchange between ██████████ and JCM as they were believed to be Apple iMessage, which are not captured by The Device service provider.

23.     On June 22, 2020, CHS 1 sent a text message to JCM on The Device suggesting

they meet with ███████ JCM responded back to CHS 1 utilizing The Device on June 23, 2020,

telling the CHS 1, "Not until the certification is done," which Affiant knows to be a reference to

the WBE certification discussed on June 18, 2020.

24.     On June 24, 2020, at approximately 1:30 p.m. utilizing The Device, JCM sent a text

message to CHS 1, "Need that paper work and need to rap with you.  We got something for you.

A contract."

25.     On June 25, 2020, CHS 1 and JCM met.  During the meeting, JCM told CHS 1 the

contract was for a project at the ██████████ " ████████ knows about it.

He asked me to look into it.  That's something that we've been doing all day, actually." JCM told

CHS 1 he saw ███████ recently at ████████ office on ████████

████████ JCM advised that they are planning to do a big renovation of the ███ and

they need WBE companies to do it, "and he ████████ said to make sure you are tied

into it."  They then discussed the importance of getting the WBE certification.  This meeting was

recorded.

26.     On June 27, 2020, JCM sent a series of text messages utilizing The Device to CHS

1, telling CHS 1 where he was and, "The Boss has another ask of you too/Talked with him earlier".

CHS 1 responded by text, "Should I come over to you or meet at different place", to which JCM

replied, "Come".  At the in person meeting at a St. Louis, Missouri restaurant, CHS 1 told JCM

the person who they were using as the woman owner of the purported WBE business does not even

know about the company and CHS 1 signed the woman's name on the original corporate

paperwork.  JCM said that was fine.  JCM then explained the City ownership of the ███ along

with the federal oversight ███████, which gives both JCM and ████████ a role in

the approval of a contract for CHS 1.  JCM told CHS 1, "He's asking for cash."  When asked who

was asking, JCM said, "███ – he wants $2,500…He just told me to ask…He asked for cash."

CHS 1 asked why ████████████ wanted cash now after he asked for checks the last time. JCM told CHS 1 that ████████████ trusts the CHS 1. CHS 1 asked when ████████████ asked for the money and JCM said it was on Wednesday [June 24, 2020]. This meeting with JCM was recorded.

27.     On June 29, 2020, CHS 1 met with JCM in the vicinity of JCM's house in St. Louis, Missouri. JCM helped CHS 1 in filling out the WBE and MBE certification paperwork. CHS 1 again advised JCM that the woman named on the WBE paperwork was not actually involved in the business. JCM stated that was fine as long as her name was on the paperwork. JCM told CHS 1 he had an inside source in the Missouri state government who would help streamline the WBE application. As directed by JCM, CHS 1 provided $2,500 cash to JCM which was intended for ████████████ in exchange for his efforts at helping CHS 1 obtain the discussed contracts. The FBI had provided this $2,500 to CHS 1 for this purpose. JCM told CHS 1 that he would give the money to ████████ [understood to be ████████████. JCM concluded the meeting by saying "I got you. You got me and you got ████████████" The meeting was recorded.

28.     Beginning July 1, 2020, and on several days thereafter, JCM told CHS 1 the steps to take to get the WBE/MBE paperwork completed. On July 1, 2020, JCM sent CHS 1 a text message utilizing The Device instructing CHS 1 to leave the notarized documents in JCM's home mailbox. Instead, CHS 1 elected to wait to deliver the documents in person. During their meeting later that day, JCM stated he planned to fax the paperwork that night. CHS 1 asked if it was possible to receive a "small contract" while they waited for the WBE/MBE certification to be completed. CHS 1 told JCM that CHS 1 would "split all the profits between me, you, and ████████" JCM concluded the meeting by stating, "████ will call me either tonight or tomorrow and I will just ask him, can we just get like a small contract now." JCM told CHS 1, "I got you," and "I will let you know what's available" and JCM will "see what kind of options he gives me." This meeting was recorded.

13

29.     When JCM submitted the notarized WBE application to the State of Missouri's Office of Equal Opportunity (OEO), JCM used his personal email account ███████████████████ as the email of record for correspondence from the state. Multiple emails have been exchanged between OEO and JCM, and some of these emails have been forwarded to CHS 1 by JCM utilizing The Device. During an October 7, 2020 telephone call between CHS 1 and an OEO employee, JCM, utilizing The Device, was added to the conference call. During this call, JCM provided information to OEO about CHS 1's WBE and JCM instructed the OEO employee to send information to his email account, ███████████████████ On October 7, 2020, ███ an employee at OEO sent an email to JCM stating, "Please complete, sign, date and return to OEO. Thanks." JCM then forwarded that email to CHS 1 utilizing The Device. JCM instructed CHS 1 to sign his/her spouse's name – knowing they were unaware of the business. After obtaining an illegitimate notary stamp from a St. Louis County official who CHS 1 was bribing for unrelated benefits, CHS 1 sent the notarized documents to JCM on October 23, 2020. OEO did not accept these documents because of the location of the signatures and notary stamp, so CHS 1 was again instructed on October 26, 2020 by JCM over text message from The Device to "Sign the document and email it back to me/Sign your wife's name." The notarized application was finally accepted by OEO and then it was forwarded for review and approval. During this review, OEO scheduled an "on-site" review [done over telephone due to COVID-19], during which they highlighted various concerns they had with the WBE application. One of the issues they discussed with CHS 1 was having his/her alderman assisting in the certification process. Several minutes into the telephone call, JCM, utilizing The Device, joined the conference call and attempted to alleviate OEO's concerns. CHS 1's spouse could have participated in the call, but their lack of knowledge about the business would have become obvious. JCM suggested CHS 1 lie to OEO, by telling OEO the spouse did not speak English, so CHS 1 would have to speak on

their behalf and/or translate for him/her. As of the date of this application, a decision from OEO on the WBE certification has not been received.

30.     While attempting to obtain WBE certification for CHS 1's business, JCM has discussed two different large contracts for CHS 1. Both plans have progressed slowly, so CHS 1 has suggested moving one along when the other slows. The ▓▓▓▓▓▓ contract was the original plan for ▓▓▓▓▓▓▓▓▓ to assist CHS 1, with JCM and CHS 1 splitting the profits. However, shortly after the June 18, 2020 meeting, JCM began discussing the ▓▓▓▓▓▓▓▓▓ project with CHS 1. In the seven months since this June meeting, JCM has offered some assistance to CHS 1 in contacting one of the large construction companies managing the ▓▓▓▓▓▓▓ JCM provided CHS 1 the name ▓▓▓▓▓ and contact information for the small business contractor for the company.

31.     On July 15, 2020, CHS 1 and JCM met to discuss the ▓▓▓▓ contract and to complete additional paperwork for the WBE certification. JCM stated he planned to fill out the majority of the WBE paperwork for CHS 1. JCM stated the ▓▓▓ demolition contract for CHS 1 would most likely be ready in four weeks. JCM estimated the project would pay $8 million, but would only cost CHS 1 $3 million to complete. This meeting was recorded.

32.     The day after ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, CHS 1 met with JCM to discuss the way forward. JCM told CHS 1 that ▓▓▓▓▓▓▓ indicated they had to move faster regarding contracts because of ▓▓▓▓▓▓▓▓▓ JCM told CHS 1 that the ▓▓▓ contract was already secured, but JCM was worried about future contracts because ▓▓▓▓▓▓▓▓▓▓▓▓. JCM told CHS 1 that despite ▓▓▓▓▓▓▓ "we still have to take care of him ▓▓▓ because he is gonna push this through." After CHS 1 told JCM that he was willing to pay ▓▓▓▓▓ once they started their contract in order to show their loyalty, JCM told CHS 1 that they would

always have to show loyalty to ███████████ because ███████████ could "stop whatever we want to do." This meeting was recorded.

33.    On August 26, 2020, CHS 1 met with JCM to discuss the ██████ contract. JCM told CHS 1 the contract for the ██████ demolition should start in late September 2020 and was worth $7.3 million. JCM told CHS 1 that ███████████ sent a "letter of consent" to the ██████ ███████████ indicating ███████████ wanted CHS 1's business to be selected for the ██████ contract. JCM stated CHS 1 will have to pay ███████████ "2" after CHS 1 receives the first check. JCM then clarified CHS 1 will need to pay ██████████ $200,000. When CHS 1 asked JCM about paying ███████████ with a check, JCM stated "it cannot be checks" and "he ███████████ knows that." This meeting was recorded.

34.    On September 15, 2020, JCM told CHS 1 that the ██████ contract was delayed, but it would most likely start in late September or early October 2020. JCM told CHS 1 that, as a member of the St. Louis Board of Aldermen Transportation Committee, he was able to select one of the contractors so he selected CHS 1's company. This meeting was recorded.

35.    On November 25, 2020, having not received a contract, CHS 1 sent a text to JCM utilizing The Device asking to meet with ███████████ so they might get a contract at ██████ ██████ On November 30, 2020, JCM responded via text message utilizing The Device, "Yes we can. But we need to finish everything with the ██████ before we have him focus on something else. One thing at a time. So we make sure we moving right! I will handle ██████ You have my cell number. What did she ask you ro (SIC) do?" CHS 1 sent the small business application he had previously received from ██████ by text message to JCM. On November 30, 2020 JCM instructed CHS 1 by text message to, "Get this filled out and get it back to her. I will deal with her./Email it to me. And I will do it. ███████████████ " JCM completed the paperwork for CHS 1 and delivered it to him in person, with instructions to scan and email it directly to ██████

16

36.     On December 19, 2020, CHS 1 sent a text message to JCM stating: "My truck's ready to roll please let's work". Shortly after that, JCM sent a text message to CHS 1 requesting a donation to JCM's reelection campaign. On December 20, 2020, CHS 1 received a text message from JCM's campaign to arrange for "faster donations". CHS 1 gave JCM $1,000 on that date. On December 21, 2020, JCM sent CHS 1 a series of text messages, including one "I have paperwork for you to sign." JCM then met with CHS 1 and showed CHS 1 three pages that JCM said were CHS 1's ███ contract. A review of these records by your affiant identified the date on these records as December 2019, for a roof replacement project on ████████ ████████████████████████ at a cost substantially lower than the $27 million project described earlier by JCM. In the presence of CHS 1, utilizing The Device, JCM forwarded CHS 1 these plans from JCM's personal email, ████████████████.

37.     On December 27, 2020, JCM came to CHS' store. JCM told CHS 1 about problems with The Device. CHS 1 has an employee who handles mobile telephones, including selling and repairing mobile phones. CHS 1 asked JCM if he wanted a new phone since he was having problems with his existing one. CHS 1 told JCM the telephone employee needed to back up The Device to the employee's Apple Mac computer in order to push the data to the new phone, which JCM consented to. The employee successfully transferred the data from The Device to the new Apple iPhone 11 provided to JCM. Approximately one hour later, JCM left the store with his new phone and he left The Device with the store employee, who gave it to CHS 1. JCM did not offer to pay, nor was he asked to pay, for the new iPhone 11. Your affiant seized The Device as evidence on December 28, 2020 and is requesting the Court's authority to search the device for evidence of criminal activity by JCM.

38.     As of the date of this application, according to CHS 1, the two $5,000 checks made payable to ████████████████████ have not been deposited, for reasons unknown to your Affiant or CHS 1.

39.     All text messages referenced in this affidavit between CHS 1 and The Device were provided to the Affiant from CHS 1 taking an individual "screenshot" of the text message directly from CHS 1's phone. CHS 1 has never communicated with JCM by call or text message on any other telephone than The Device. CHS 1 is not aware of JCM owning or using any phone other than The Device until turning it over to CHS 1 in exchange for the new phone.

40.     The FBI has debriefed additional people with knowledge of the individuals discussed throughout this affidavit and reviewed bank records of other likely victims. Their accounts of demands for cash in exchange for official action by JCM are consistent with CHS 1's account.

41.     Court ordered Pen Registers on The Device, up to the current date, reveal that JCM has regular telephone conversations and text messaging with a number of other politicians in St. Louis, some of whom have previously accepted bribes from CHS 1. The Pen Registers also show call and text message activity with business owners in JCM's ward who have complained about JCM demanding money while threatening to close their businesses.

42.     On March 18, 2020 your affiant received a federal search warrant in the Eastern District of Missouri to search JCM's Apple account. The Apple iCloud backup is an option selected by a user and is not automatic. The JCM iCloud search warrant return contained text messages for two distinct timeframes: April 2019/May 2019 and December 2019/January 2020, with no content outside these dates. A search of the actual phone will likely provide significantly more information than what was obtained through the iCloud warrant. Although limited in scope, the search warrant return from JCM's iCloud account contained text messages that were pertinent to the investigation.

a.     A text message exchange between JCM and an individual identified as ▮▮▮▮ on December 10, 2019. ▮▮▮▮ asked JCM, "What do you want me to tell ol boy?" JCM replied, "Are ya'll cool?" [JCM used similar language about being "cool"

18

with CHS 1 during the January 24, 2020 bribe payment from CHS 1 to JCM] ▮ replied, "Like my brother" and "He's just a piece of work". JCM replied, "$700".

     b.     On January 13, 2020, JCM sent a text message to ▮, which read, "Thank you Big Brother! Im (SIC) expecting around 200 residents! I'm gone (SIC) pack the room for ya!" The text message contained a picture of a townhall flyer that read,

▮

▮

▮ responded by text message to JCM less than 30 minutes later, stating, "Very good it will be my first time at the rec center. Looking forward to it."

43.     Based on my training and experience, I know that text messages sent between JCM and others, as well as email communications, are likely stored on The Device used by JCM.

## TECHNICAL CONSIDERATIONS

44.     Based on my knowledge, training, and experience, as well as the experience of agents and investigators with specialized training involving cellular telephones and digital evidence, I know the following information concerning electronic devices: cellular telephones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Phones create and keep log files associated with calls and text messages sent from and received by the device. I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for lengthy periods of time on the device. This information can sometimes be recovered with forensics tools.

45.     The FBI employs personnel with specialized knowledge, training and experience relating to computer and digital evidence, including evidence located on cell phones. Based on my

19

knowledge, training and experience, and the knowledge, training and experience of law enforcement personnel involved in computer and digital forensics, I am aware of the following factors and considerations that may be pertinent:

      a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.     In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

c.     Electronic devices, such as wireless telephones, can store information for long periods of time. This information can sometimes be recovered from the device using forensic examination tools.

46.     This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described herein, but also forensic evidence that establishes how the cell phone was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on The Device, to include the text messages listed above and other related messages. Cellular telephones typically keep log files of calls and messages received and made from the device. These log files include the phone numbers called and received. The log files can stay on the device for long periods of time.

47.     Forensic evidence on a wireless telephone can also indicate who has used or controlled the wireless telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Specifically, there is reason to believe, based on the way that data is stored on wireless telephones, that the incriminating text messages and contact history identified from the Pen Register data and cooperating witnesses described above related to John Collins-Muhammad will also be contained on Collins-Muhammad's cellular telephone itself.

48.     Additionally, based on my training and experience, I know that those who have committed crimes often delete incriminating evidence from their cellular telephones.

49.     Based on my knowledge, training, and experience, as well as the experience of agents and investigators with specialized training involving cellular telephones and digital evidence, I know the following information concerning electronic devices: an iPhone is a high-end cellular telephone that combines the function of a personal digital assistant and a mobile phone.

21

This includes the ability to communicate with other cellular telephones by using a text-messaging feature, email, or an Internet-based instant messaging application. Most cellular telephones also have the ability to connect to the Internet via Wi-Fi and mobile broadband access. I know from my training and experience that cellular telephones, including smartphones, are capable of storing large amounts of data, including call histories (showing the date, time, and destination/origin phone number dialed), emails, and message content of texts placed/received.

50.     Obtaining cellular telephone records stored in a cellular telephone may be helpful to law enforcement in many ways, including the following: identifying suspects, co-conspirators, or persons involved in or related to criminal activity; identifying victims; helping to establish a timeline of events surrounding criminal activity; and documenting contact between co-conspirators.

51.     Specialized software and computer hardware can be used to examine the contents of cellular telephones and smartphones. I know this software is capable of retrieving call history, text message history, and details, pictures, and videos from numerous types of mobile phones and smartphones. In some cases, the software is able to retrieve previously stored data even after a user has deleted it from the phone's memory.

52.     The search procedure for electronic data contained in the hardware and software of the cellular telephone described in Attachment A may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

      a.     Initial triage to determine what, if any, peripheral devices or other electronic devices have been connected to the seized device;

      b.     A preliminary scan of image files contained on the device to help identify relevant evidence, the known victim, or any potential victims, as well as a scan for encryption software;

      c.     Forensic imaging of the device that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged, become encrypted and accordingly unavailable for examination;

      d.     Examination of all of the data contained in the device's hardware, software, or memory storage to view the data to determine whether that data falls within the items to be seized as set forth herein;

      e.     Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not evidence of the offenses specified above);

      f.     Surveying various file directories and the individual files they contain;

      g.     Opening files in order to determine their contents;

      h.     Scanning storage areas;

      i.     Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and

      j.     Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

53.    I anticipate executing this warrant pursuant Rule 41 (e)(2)(B), which would permit a search of The Device identified in Attachment A consistent with the warrant. Upon retrieving The Device from evidence storage at FBI, government-authorized persons will review that information to locate the items described in Attachment A. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire

23

medium that might expose many parts of the device to human inspection in order to determine whether it is evidence described by this warrant.

## CONCLUSION

54.     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offenses being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.     The foregoing has been reviewed by Hal Goldsmith, Assistant United States Attorney, U.S. Attorney's Office, Eastern District of Missouri.

## ᴵREQUEST FOR SEALING

56.     I further request that the Court order that all papers in support of this application. including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

I state under the penalty of perjury that the foregoing is true and correct.

Special Agent
Federal Bureau of Investigation

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on _____. 2021.

HONORABLE JOHN M. BODENHAUSEN
United States Magistrate Judge
Eastern District of Missouri

24

## ATTACHMENT A

## ITEMS TO BE SEARCHED

The following materials, in any format or medium, which constitute evidence, instrumentalities, and fruits of the criminal violations of 18 U.S.C. §666, §1341, §1343, §1346, and §1951 and involve John Collins-Muhammad, and others from ███████████ through the time of the execution of this warrant that may be deemed instrumentalities, fruits, or evidence of the aforementioned crimes to include:

1.    The cellular telephone, that being an Apple iPhone 7, serial number ██████████████ with associated phone number █████████ (The Device)

2.    For the Device, all records and information to include:

    a.    Call Logs showing numbers called and received, to include deleted logs;

    b.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    c.    Internet browsing history, including records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    d.    Photographs, videos, and other forms of media documenting the events that are the subject of this warrant.

    e.    Any and all contact lists, address books, in whatever form regarding coconspirator contact information, to include deleted information.

    f.    all bank records, checks, credit card bills, account information, and other financial records.

      g.     Text message records, including the content of messages as well as any logs showing text messages sent and received, to include deleted information

      h.     Any and all documents, notes, and records, including e-mail correspondence in whatever form, including digital, relating to the matters set forth in the attached Affidavit, to include deleted information

      i.     Any and all documents, notes, and records relating to the ownership and usage of the cell phone being searched

      j.     Any and all contact lists, address books, in whatever form regarding coconspirator contact information, to include deleted information

3.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.



**HSD**

**(Highly Sensitive Document)**

FILED

FEB 8 2021

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>4:21 MJ 1001 JMB | Date and time warrant executed:<br>01/26/2021 | Copy of warrant and inventory left with:<br>N/A |
| Inventory made in the presence of:<br>N/A | | |

Inventory of the property taken and name of any person(s) seized:

Apple iPhone was already in possession of the F.B.I. After the search warrant was signed, the search of the device began the same day. A more complete forensic search of the phone is ongoing.

---

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 02/08/2021

████████████████████████

*Printed name and title*

---

GREGORY J. LINHARES, CLERK
A TRUE COPY OF THE ORIGINAL
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
BY:

DEPUTY CLERK